Filed 5/31/13  In re K.J. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.J. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,          Plaintiff and Respondent, | E056898 (Super.Ct.No. RIJ120773) **OPINION** |
| v. | |
| F.C. et al.,          Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Matthew C. Perantoni, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Reversed with directions.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant F.C.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant T.J.

Pamela J. Walls, County Counsel, and Anna M. Deckert, Deputy County Counsel, for Plaintiff and Respondent.

F.C. (Mother) and T.J. (Father) appeal after the termination of their parental rights to K.J. and A.J. at a Welfare and Institutions Code section 366.26 hearing.[1] The claims on appeal are as follows:

1.      Mother and Father both claim that the juvenile court erred by finding that the Indian Child and Welfare Act (ICWA) did not apply, because the notice was deficient.

2.      Father, joined by Mother, contends that the trial court erred by finding that the beneficial parent-child exception of section 366.26, subdivision (c)(1)(B)(i) did not apply.

3.      Mother claims that the juvenile court erred by finding the children adoptable.[2]

I

PROCEDURAL AND FACTUAL BACKGROUND

On December 8, 2010, Riverside County Department of Public Social Services (the Department) received a report of general neglect for K. (who was born in October 2008) and A. (who was born in September 2009). Prior to this date, Mother, K., and A.

---

[1]      All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]      Father did not join in this argument.

had been living in a shelter for battered women and children in Los Angeles County. On December 6, 2010, Father, who admitted he was the biological father of the children, showed up at the shelter, and several people witnessed him threaten Mother. Father took a swing at Mother. He became angry when staff and security became involved.

Mother had been at the shelter since October 29, 2010. She had left the shelter on several occasions without permission and had tested positive for marijuana on December 3, 2010. Mother had a history of mental illness and was not taking her medication. She had planned to stay at the shelter until she could receive subsidized housing but had left in the middle of the night on December 8, 2010. She moved back in with Father at his home in Riverside County.

A social worker went to Father's home on December 9. The home was clean, and there were no safety hazards. However, a medical marijuana container was found in the bedroom. It was accessible to K. and A. Mother was there with the children. She reported that both she and Father had been in group homes when they were younger. Mother was pregnant and due January 2011. She admitted that she had smoked marijuana within the prior few weeks. She claimed that when Father came to the shelter he only yelled at her and did not hit her.

Father denied he hit Mother at the shelter and denied any domestic violence. K. was congested; Mother did not have a breathing machine for K.

Mother and Father had another child, who was older than A. and K., who had resided with the paternal grandmother since infancy. Father reported he had three other children who lived with their respective mothers.

Father was on disability due to a mental "disability." He was also on probation. He had tested positive for marijuana on December 3, 2010. The paternal grandmother reported that Father had developmental delays. He had been prescribed medication for depression but refused to take it. He had a significant criminal history beginning in his "early teens." The paternal grandmother reported that Father had committed every crime as a juvenile except for murder — "he's done everything . . . but kill somebody." She reported that Mother first became pregnant when she was 15 years old and had been pregnant for the prior four years. She could not take medication for her mental illness due to the pregnancies. The paternal grandmother also reported that the relationship between Father and Mother was very volatile.

In 2009, the paternal grandmother had to pull Father off of Mother, who was on top of her, choking her. There had been a prior referral for the family because it had been reported that Mother kicked out the apartment windows while holding K. Mother and Father had fought because Father had impregnated another woman.

In the past, Father had kicked Mother out of his home if she did not have money. Mother would come back if Father wanted her back. Father yelled obscenities at Mother in front of the children. Father and Mother only fed the children junk food, and K. was always sick.

4

K. and A. were detained on December 9, 2010. K. was taken for evaluation and found to have bronchitis. A also had bronchitis, in addition to an ear and throat infection.

On December 13, 2010, the Department filed a section 300 petition against Mother and Father. It alleged under section 300, subdivision (b) that the parents engaged in domestic violence, they both abused marijuana, they exposed the children to drugs and were under the influence while caring for the children, they both suffered from unresolved mental health issues, Mother led a transient lifestyle, they both failed to benefit from prior services, and they failed to get adequate medical care for A. and K.

At a hearing held on December 14, 2010, the juvenile court found a prima facie case, and ordered K. and A. detained. It also ordered that Mother and Father fill out an ICWA-020 form. K. and A. were placed in foster care. Weekly supervised visitation was ordered.

In a jurisdictional/dispositional report filed on January 7, 2011, the Department recommended that A. and K. remain in foster care and that Father and Mother be granted reunification services. The Department recommended that both parents undergo psychological evaluations. The Department confirmed that there was a previous referral on March 12, 2009, for the incident involving Mother kicking out the apartment window. Mother admitted that she kicked out the window.

A social worker attended a visit on December 30, 2010. A. and K. did not want to end visitation with Mother and Father, but after hesitating for a moment, went with the

5

foster mother.  Visitation in general was going well.  Mother and Father played with and held the children during visitation.

Mother was interviewed.  She was born in December 1991.  She claimed she called Father to the shelter because she needed diapers.  Father had gotten lost on the way and was angry with Mother.  They were arguing when a worker at the shelter heard them.

Mother was sent to a home when she was 12 years old because she was misbehaving.  She claimed she had been raped when she was 10 years old, but her parents did not believe her.  She returned to her parents' home when she was 15, met Father, and was soon pregnant.  Mother denied any physical domestic violence between her and Father.  She used marijuana only when the children were not with her.  She did not take medication for her mental issues because of her pregnancies.

Father was born in May 1985 and claimed to have been born with spinal meningitis, which caused developmental delays.  Father was 10 years old when his own father died.  He dropped out of school in the 11th grade.  On occasion he took medication for anxiety and depression.  He admitted that he has seven children.

Both Father and Mother wanted the children placed with the paternal grandmother.  In a previous referral, the paternal grandmother was to take legal guardianship of the children, but the paperwork was never completed.  Father "was very upset" that the children were in foster care and wanted them placed with the paternal grandmother.  K. and A. were adjusting well to the foster home.  They were in good health but both had breathing problems.

On January 11, 2010, the Department filed an amended petition adding C.J. (which was amended again on February 9, 2011, to correct his name), who was born in December 2010. It was alleged as to C. that the parents tried to hide his birth and that Mother used marijuana during the pregnancy.[3] The remainder of the petition remained the same. According to the detention report for C., Father and Mother placed C. with a cousin because they were afraid he would be detained. Father claimed he had not placed C. with the paternal grandmother because she was too old and sickly to take care of him; however, the paternal grandmother was only 46 years old and was not sick. Father yelled at a social worker about the cases involving the children. C. was placed in foster care, but not in the same home as A. and K.

An additional jurisdictional/dispositional report was filed on February 9, 2011. Mother had started taking medication and was less anxious and depressed. Mother denied she and Father tried to hide C.

K. and A. were developing normally. They missed Mother and Father but had adjusted to their foster parents. Visitation was taking place twice per week, and the visits were going well.

The jurisdictional/dispositional hearing was conducted on February 15, 2011. On that day, the Department filed a third amended petition deleting some of the evidence

---

[3]     C. is not a subject of the instant appeal. We will only refer to proceedings pertaining to C. as they relate to the termination of parental rights for K. and A.

7

supporting the allegations. Father and Mother objected to the amended petition but presented no affirmative evidence. The juvenile court found the allegations in the third amended petition true. Mother and Father were granted six months of reunification services. Visitation would be liberalized if Mother and Father were complying with their case plan.

In the six-month status review report filed on August 2, 2011, it was recommended that reunification services continue for Father and Mother. K. and A. remained in foster care together; C. was in another foster home. Father and Mother remained unemployed. Father continued to be "angry and accusatory." K. and A. were developing normally. K. occasionally suffered from bronchitis. K. and A. had adjusted well to their foster home.

Mother had not attended a substance abuse program. She had moved to Los Angeles County, which she claimed made it difficult to comply with services. Mother had completed some services by the time of the report. Father was asked to leave an anger management program because of his behavior. He had completed some services.

Since February 15, 2011, Father and Mother had not been consistent with visitation. Mother had attended more visits than Father, and the visits were appropriate. Mother interacted well with all three children. During some visits, Father had shown anger and aggression toward K. and A. Father spent most of his time at visits on his phone.

At a hearing on August 16, 2011, the juvenile court extended reunification services for six more months.

The Department filed a 12-month status review report on February 2, 2012. The Department recommended that reunification services be terminated for Father and Mother and that a section 366.26 hearing be set with a permanent plan of adoption.

The paternal grandmother, on January 24, 2012, wanted to be considered to adopt all three children. However, there had been a referral for her to the Department for using improper punishment on the older child in her care. K. and A. were both developing normally and were doing well in the foster home. K. had a psychological evaluation. He presented as highly anxious. It was recommended he stay in his foster home, where he had a structured and caring environment.

No home could be found to take all three children. The Department noted K. and A. were in their third placement. The first placement was not appropriate since the family only spoke Spanish, and the second placement ended because of "unforeseen circumstances of the foster parents." K. and A. had been in the current foster home since September 2011. They had adjusted to the home and were very comfortable in their placement.

Mother and Father had not completed parenting classes or domestic violence classes. Father had been diagnosed with major depression but had not sought treatment. He had unresolved anger issues. Mother had no stable housing or income. Both Father and Mother had failed to address their problems with domestic violence.

9

As for visitation, Mother and Father had been inconsistent. They failed to make themselves available for C.'s birthday or Christmas. When they did visit, Father and Mother were appropriate, and the children responded well to them.

On February 24, 2012, and March 13, 2012, addendum reports were filed. Mother and Father had not completed their services. Father complained that he did not complete services because the service providers were rude or unsympathetic. Father and Mother complained they had no transportation, but bus passes had been provided to them.

On March 6, 2012, Father and Mother had gone to a family care center demanding counseling and services. Father became aggressive and angry when he was told he would have to go through an enrollment procedure. Mother claimed to be seeking housing in Riverside County.

On March 16, 2012, the review hearing was held. Mother and Father failed to appear and did not advise the court or counsel the reasons for their absence. Reunification services were terminated. A section 366.26 hearing was set.

On June 27, 2012, the Department filed a report for the section 366.26 hearing. The permanent plan was adoption. In the report, the Department asked that the section 366.26 hearing be continued for 120 days in order to assess the prospective adoptive family. A. and K. had been moved to a permanent home for adoption just three weeks prior to the report.

A. and K. were adjusting well to the permanent home where they would be adopted. K. had become very open, focused, and willing to talk and share and was

10

happy. The new placement seemed to be good for K. A. also had adjusted well to the new home. Their transition had been better than expected.

During a visit on May 16, 2012, Father's anger continued to escalate. He directed his anger at Mother due to reunification services being terminated. Father's anger upset the children, and they started to cry. Mother did nothing to calm Father. The visit had to be terminated. The foster parents were concerned that Mother was in danger. Mother and Father left together. Mother and Father missed the next two visits. A. and K. were "fearful and anxious" when the foster parents mentioned visitation with their parents.

The Department was unable to contact Mother for two weeks. The adoptive parents for K. and A. and the prospective adoptive parents for C. were willing to maintain the sibling relationship. On July 5 and 11, 2012, addendum reports were filed. The Department recommended termination of parental rights and adoption by the current caregivers. The addendum included the adoption assessment report.

A. and K. continued to do well in their prospective adoptive home. They were in good health and developing normally. Both were bonding with the prospective adoptive parents. The family had a good home; supportive families; and a strong, committed relationship.

On June 11, 2012, during a telephone conversation between a social worker and Father, Father became angry and accused the Department of taking his children. Father stated, "[Y]ou supposed to be black . . . , how could you just take my kids like that and

11

not giving them back. You aint black!" Father used profanity, and the social worker terminated the telephone call.

During a supervised visit on July 2, 2012, Father brought two other children and two adults. He was angry throughout the visit. He claimed he could do what he wanted during the visit and would no longer listen to the Department. The social worker almost had to call the police.

On July 23, 2012, the section 366.26 hearing was conducted, as will be set forth in more detail, *post*. Mother's and Father's parental rights were terminated, and K. and A. were freed for adoption. Mother and Father filed notices of appeal.

II

ICWA NOTICE

Both Father and Mother contend that the ICWA notice was insufficient.

A.    *Additional Factual Background*

On December 14, 2010, Mother filed an ICWA-020 form. She claimed to have some Indian ancestry. Father also filed the form. He claimed "Cherokee" on "PGF's side." Notice was given not only to the Bureau of Indian Affairs (BIA), but also to the Cherokee Nation, Eastern Band of Cherokee Indians, and United Keetoowah Band of Cherokee. The notice stated that Father's biological father (the paternal grandfather) was Roy Jones but provided no further information, such as his birth date or middle name. He was deceased and died in Montgomery, Alabama.

12

The United Keetoowah Band of Cherokee responded that they would not intervene because the family did not appear to be members. The Eastern Band also responded that it would not intervene because the family were not members.

At a hearing on January 13, 2011, the Department asked that the juvenile court find that ICWA notice had been given as to Father. The juvenile court stated, "The Court will find good notice pursuant to Indian Child Welfare Act and will find that as to the United Keeto[o]wah Indians, that the Indian Child Welfare Act does not apply to that band/tribe."

In a letter dated March 31, 2011, from the Cherokee Nation, addressed to the Department, it stated that the notice was not considered proper because it lacked the middle name of paternal grandfather, Roy Jones, and his date of birth. The letter stated, "It is impossible to validate or invalidate this claim without more complete family information." The letter also stated that two previous letters had been sent, and no response was received. The tribe refused to conduct any further search.

In the Department's six-month review report filed on August 2, 2011, it stated that K. and A. were not members of the Eastern Band of Cherokee Indians. It further stated, "The Department has not heard from the other two tribes and therefore ask the Court to make a finding that the Indian Child Welfare Act does not apply." Thereafter, the juvenile court found that ICWA did not apply.

B.    *Lack of Notice*

"Congress enacted ICWA to further the federal policy "'that, where possible, an Indian child should remain in the Indian community. . . ."'" [Citation.]" (*In re W.B., Jr.* (2012) 55 Cal.4th 30, 48.)  "ICWA requires that when a court knows or has reason to know that an Indian child is involved in a dependency matter, it must ensure that notice is given to the relevant tribe or tribes.  [Citation.]" (*In re J.O.* (2009) 178 Cal.App.4th 139, 154.)

ICWA notice must include "the name, birthdate, and birthplace of the Indian child; his or her tribal affiliation; . . . and information about the Indian child's biological mother, biological father, maternal and paternal grandparents and great-grandparents or Indian custodians, including maiden, married and former names or aliases; birthdates; places of birth and death; current and former addresses; tribal enrollment numbers, and/or other identifying information.  [Citations.]" (*In re Louis S.* (2004) 117 Cal.App.4th 622, 630.)  "The burden is on the [Department] to obtain all possible information about the minor's potential Indian background and provide that information to the relevant tribe or, if the tribe is unknown, to the BIA.  [Citation.]" (*Ibid*.)  "Notice is meaningless if no information or insufficient information is presented to the tribe to make that determination.  [Citation.]" (*Ibid*.)

"'The [trial] court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings.  [Citation.]  We review the trial court's

14

findings for substantial evidence. [Citation.]' [Citation.]" (*In re Christian P.* (2012) 208 Cal.App.4th 437, 451.)

Here, the Cherokee Nation advised the Department that it could not conduct a valid search because the information regarding the paternal grandfather was insufficient. The Department did not respond. There is nothing in the record as to whether the Department investigated the request from the Cherokee Nation. The Department remained in contact with the paternal grandmother throughout the proceedings, and it is conceivable that she could provide the information. Instead, the Department represented to the juvenile court that it had not heard from the Cherokee Nation. The notice to the Cherokee Nation was deficient.

The Department essentially concedes that the notice was insufficient. It contends, however, despite the insufficient notice, that any error was harmless since there was no evidence that the information could be obtained. Further, it contends that Father and Mother have failed to show that such evidence can be discovered.

We disagree with the Department. "Deficiencies in an ICWA notice are generally prejudicial but may be deemed harmless under some circumstances." (*In re E.W.* (2009) 170 Cal.App.4th 396, 402.) For instance, a deficiency in ICWA inquiry and notice is harmless error when, even if notice has been given, the child would not have been found to be an Indian child or, despite defective notice, the tribe eventually took part in the proceedings. (*In re S.B.* (2005) 130 Cal.App.4th 1148, 1162.) These circumstances are not present in this case. The Cherokee Nation informed the Department it could not

15

conduct a valid search without the information and the Department failed to follow up. There is nothing else in the record to support that if the information had been provided, the Cherokee Nation would find that the children were not Indian children.

The Department did not comply with ICWA's notice requirements because it did not supply the Cherokee Nation with information that was potentially available, despite a specific request from the tribe. On this record, we cannot find the Department substantially complied with ICWA's notice requirements, and we will remand the matter. (See *Tina L. v. Superior Court* (2008) 163 Cal.App.4th 262, 268.)

III

BENEFICIAL PARENT EXCEPTION OF SECTION 366.26,

SUBDIVISION (c)(1)(B)(i)

Father, joined by Mother, argue that the beneficial parental exception of section 366.26, subdivision (c)(1)(B)(i) applied, and the juvenile court erred by terminating their parental rights.

A.      *Additional Factual Background*

At the section 366.26 hearing, Father testified in regard to the beneficial parental exception. He testified that he had maintained visitation. He indicated that K. and A. would run up to him at the visits and show affection to him. They called him "dad." He claimed to be attentive and involved during the visits. K. told Father that he wanted to come home. Father had a bond with the children. He wanted legal guardianship in place of adoption.

16

Father argued that the benefit of continuing the relationship outweighed the benefits of adoption. Mother presented no evidence but argued the beneficial parental bond exception applied.

The juvenile court found by clear and convincing evidence that the exception did not apply. It terminated parental rights (ruling Father was the presumed father).

B.  *Analysis*

At the section 366.26 hearing, the sole issue "'is whether there is clear and convincing evidence that the child is adoptable.' [Citations.]" (*In re Josue G.* (2003) 106 Cal.App.4th 725, 733; see § 366.26, subd. (c).) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) If the court finds that a child may not be returned to his or her parents and is likely to be adopted, it must select adoption as the permanent plan, unless it finds that termination of parental rights would be detrimental to the child under one of the seven exceptions set forth in section 366.26, subdivision (c)(1)(A) and (c)(1)(B)(i) through (v). (See *In re Jamie R.* (2001) 90 Cal.App.4th 766, 773.)

The parental benefit or "beneficial relationship" exception is set forth in section 366.26, subdivision (c)(1)(B)(i). The exception applies where "'[t]he parents . . . have maintained regular visitation and contact with the minor and the minor would benefit from continuing the relationship.'" (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.)

"The parent must do more than demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that parent and child find their visits

17

pleasant.  [Citation.]  Instead, the parent must show that he or she occupies a 'parental role' in the child's life." (*In re Derek W., supra,* 73 Cal.App.4th at p. 827.)  "The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citations.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.)  "'The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions.  [Citation.]' [Citations.]" (*In re C.B.* (2010) 190 Cal.App.4th 102, 122.)

"We review the trial court's findings for substantial evidence.  [Citation.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228; see also *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)  "'On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order.'  [Citation.]" (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.)  Thus, "a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.'  [Citation.]  Unless the undisputed facts established the existence of a beneficial parental . . . relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed." (*Bailey J.,* at p. 1314.)

18

Here, the juvenile court did not state in its ruling whether it found visitation was regularly maintained, e.g., that the parents had shown the first prong of the exception. Father argues that visitation was "illusory," relying upon *In re Hunter S.* (2006) 142 Cal.App.4th 1497.[4] Moreover, Father claims that any difficulties he had during visitation were due to his mental disabilities and because the visits were supervised by the foster parents, who incited his anger problems. Since the juvenile court did not state if it was finding that Father and Mother had maintained regular visitation, and because Father and Mother cannot show a beneficial relationship, we will assume that they maintained regular visitation.

Father and Mother cannot prove their relationship with the K. and A. benefitted the children to such a degree as to outweigh the well-being they would gain in a permanent home with adoptive parents. (*In re K.P., supra,* 203 Cal.App.4th at p. 621.) "The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B.* (2002) 97 Cal.App.4th

---

**4** In *Hunter S.*, *supra,* 142 Cal.App.4th 1497, the child refused to visit with the mother, and the mother had no visitation throughout the dependency proceeding. (*Id. at* pp. 1501-1502.) The court found that a parent is denied due process if effective visitation is denied. (*Id*. at pp. 1504-1505.)

454, 467, fn. omitted.)  Mother and Father did not show that their relationship with K. and A. was important and beneficial.

Father and Mother came to the attention of the Department due to their domestic violence.  Throughout the dependency proceedings, neither Father nor Mother ever addressed the domestic violence issues.  Father's anger escalated throughout the proceedings.  Father yelled at a social worker, calling her names and yelling obscenities.  He became so angry during a visit that he made K. and A. cry.  The foster parents reported that after this outburst, the children were fearful and anxious whenever the foster parents would mention visitation with Father and Mother.  This certainly was not a beneficial relationship for K. and A.  Mother did nothing to shield her children from Father's angry outbursts.

Moreover, there was no evidence of a bonded relationship.  Although K. and A. recognized Father and Mother during visitation, and there were reports that Father and Mother played with K. and A., there simply was no showing that they had a parental bond.  Both Mother and Father created an uneasy environment for the children.  Mother and Father failed to establish the existence of a beneficial parental that warrants reversing the juvenile court's order.[5]

---

[5] Father cites to the sibling exception in section 366, subdivision (c)(1)(B)(v) in that C. was placed with a different adoptive family.  Father and Mother never argued in the juvenile court that the sibling exception applied.  "The juvenile court does not have a sua sponte duty to determine whether an exception to adoption applies." (*In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295, superseded by statute as stated in *In re K.H.* (2011)

*[footnote continued on next page]*

Moreover, even if Mother and Father could establish a beneficial relationship, they cannot show that termination of the parental relationship was detrimental to K. and A. (*In re Bailey J., supra,* 189 Cal.App.4th at p. 1315.) We review this determination under an abuse of discretion standard. (*Ibid*.) Mother and Father had done almost nothing on their case plans and had outbursts during visitation. Mother was only 19 years old and had four children. Father was also young. Both of them needed to complete services to help with their parenting, but they refused to participate. On the other hand, the children had instantly bonded with their adoptive parents. Both K. and A. were happy, and K. was thriving. The adoptive parents for K. and A. and the prospective adoptive parents for C. were willing to maintain the sibling relationship. Based on the foregoing, the juvenile court did not abuse its discretion by finding that the parental benefit exception did not apply in this case and in terminating the parental rights of Mother and Father.

IV

ADOPTABILITY

Mother appeared to contend in her opening brief that the juvenile court erred by refusing to grant a continuance of 120 days requested by the Department in order for it to complete its adoption assessment. However, in her reply brief, she clarifies that she is

---

*[footnote continued from previous page]*
201 Cal.App.4th 406.) A parent who fails to raise an exception to the termination of parental rights below, waives the right to raise the issue on appeal. (*Rachel M.,* at p. 1295; *In re Erik P.* (2002) 104 Cal.App.4th 395, 402-403.) Mother and Father have forfeited this argument on appeal.

arguing that the juvenile court erred by finding that K. and A. were adoptable by clear and convincing evidence. The absence of the continuance diminished the evidence supporting the finding of adoptability.

A. *Additional Factual Background*

In the section 366.26 report, the Department noted that A. and K. had just been moved to the adoptive parents' home and that a continuance would be sought in order to complete the adoption assessment. A hearing was conducted on July 16, 2012. Father noted that a 120-day continuance had been requested by the Department in its June 27, 2012, report. However, the Department had filed an addendum report on July 5, 2012, which contained the prospective adoptive assessment. The Department was ready to proceed. Father wanted a continuance because he claimed he was not prepared to proceed. A continuance to July 23, 2012, was ordered because of good cause for the late filing of the adoption assessment. At the section 366.26, the Department recommended adoption and was ready to proceed with termination of parental rights.

In ruling to terminate parental rights and ordering adoption as the permanent plan, the juvenile court stated, "[I]t is likely that the minor children will be adopted[.]" It found that adoption was in the best interests of K. and A.

B. *Adoptability*

We have previously stated that adoption is the permanent plan preferred by the Legislature. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 573.) "The juvenile court may terminate parental rights only if it determines by clear and convincing evidence that

22

it is likely the child will be adopted within a reasonable time. [Citations.] ""'"Clear and convincing" evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind. [Citations]'" [Citations.]' [Citation.] Review of a determination of adoptability is limited to whether those findings are supported by substantial evidence. [Citation.]" (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1060-1061; see also *In re Asia L.* (2003) 107 Cal.App.4th 498, 509-510.)

General adoptability "focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649, italics omitted.) "[I]t is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' [Citations.]" (*Ibid*.)

Here, K. and A. were generally adoptable. They both were developing normally and had no disabilities. At one time K. had problems with anxiety. However, by the time he was placed in the prospective adoptive home, he was happy and adjusting well. Although the prospective adoptive home was the fourth placement for A. and K., it does not impact this determination that they were generally adoptable. The first foster home was not appropriate because the family only spoke Spanish, and in the second home, unforeseen circumstances for the foster family required that K. and A. be moved. There is no information as to why K. and A. were moved to the final adoptive home, but it is not evidence that they were not generally adoptable.

Moreover, even if we were to consider that K. had some developmental problems, both K. and A. were specifically adoptable. "[I]n some cases a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child." (*In re Sarah M., supra*, 22 Cal.App.4th at p. 1650.) Thus, a child may be "deemed adoptable based solely on the fact that a particular family is willing to adopt him or her . . . ." (*In re Carl R., supra,* 128 Cal.App.4th at p. 1061.)

By the time of the section 366.26 hearing, the Department had completed an adoptive assessment. The prospective adoptive parents were willing to adopt K. and A. Based on the foregoing, the juvenile court court's finding that the K. and A. would likely be adopted was supported by the evidence.

V

DISPOSITION

The juvenile court shall order the Department to give notice in compliance with ICWA and related federal and state law. Specifically, they shall be ordered to give valid notice to the Cherokee Nation. Inquiry should be made of the paternal grandmother, or any other family members, as to the birth date and middle name of Roy Jones. If additional information is obtained, notice should also be given to the two other Cherokee tribes.

Once the juvenile court finds that there has been substantial compliance with the notice requirements of ICWA, or if the information is not available, it shall make a finding with respect to whether the children are Indian children. If the juvenile court finds that the children are not Indian children, it shall reinstate the original order terminating parental rights. If the juvenile court finds that the children are Indian children, it shall set a new section 366.26 hearing and it shall conduct all further proceedings in compliance with ICWA and related federal and state law.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
J.

We concur:

RAMIREZ
P. J.

HOLLENHORST
J.